## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JUDITH JIMENEZ, KATHY FOGEL, and STEPHANIE VIL, on behalf of themselves and all others similarly situated, | No. 1:20-cv-07699-NLH-SAK |
| Plaintiffs, | **OPINION** |
| v. | |
| T.D. Bank, N.A., | |
| Defendant. | |

**APPEARANCES**:

RICHARD M. GOLOMB
KENNETH J. GRUNFELD
GOLOMB & HONIK, P.C.
1835 Market Street
Suite 2900
PHILADELPHIA, PA 19102

    *On behalf of Plaintiffs*

MARGARET MARY DOYLE
SUSAN M. LEMING
BROWN AND CONNERY, LLP
360 HADDON AVENUE
WESTMONT, NJ 08108

    *On behalf of Defendant*

**HILLMAN**, District Judge

This matter is a putative class action brought by Plaintiffs, a group of individuals who held accounts with Defendant T.D. Bank, N.A., concerning allegations that Defendant opened and reopened bank accounts in Plaintiffs' names without authorization.  Presently before the Court is Defendant's motion

to dismiss all claims.  For the reasons expressed below,
Defendant's motion will be granted in part and denied in part.

## BACKGROUND

Plaintiff Judith Jimenez is a Florida resident and citizen
who opened a checking account with TD Bank's predecessor,
Mercantile Bank, in 2005.  When Mercantile was acquired by TD
Bank in 2010, her account became a "TD Simple Checking Account."

Under TD Bank's Personal Deposit Account Agreement ("the
Agreement"), which governs accounts like Plaintiffs', TD Bank
"reserves the right to . . . terminate any Account at any time,
and for any reason, or no reason without notice to" the
accountholder.  (ECF No. 1-1 at 26).  On April 15, 2020,
Defendant exercised this discretion and closed Jimenez's account
without notice.  At the time the account was closed, Jimenez had
a positive balance of $342.65, and Defendant issued and mailed
to her a check in that amount that same day.  The check
indicated it was for a closed account, and Jimenez's April 2020
bank statement further noted that the account had been closed
and the balance had been withdrawn on the day it was closed.

Two days later, on April 17, 2020, Defendant utilized the
personal information it had retained in its database and opened
an account in Jimenez's name, without her knowledge and without
having obtained her permission.  Plaintiff alleges that
Defendant opened the unauthorized account for four improper

2

reasons: "(1) to reverse a provisional credit of $12.31 that TD had previously issued to Ms. Jimenez; (2) to process a $35.00 check that Ms. Jimenez had written prior to TD Bank closing the account; (3) to assess Ms. Jimenez a monthly maintenance fee of $4.99 for her account; and (4) to assess bogus fees that amounted to nearly 100% profit for TD."  (Amended Complaint, ECF No. 1 at ¶ 36).  On April 20, Defendant refused to pay the $35 check, and then assessed Jimenez both a $35 "Overdraft-Returned Fee" for that transaction and a $35 "Overdraft-Paid Fee" for the provisional credit reversal; through these two fees and the previously referenced $4.99 monthly maintenance fee, Defendant therefore collected $74.99.  Id. at ¶¶ 37-38.

Two days later, with Jimenez's account now re-opened, her tax refund was deposited into it.  Since her account balance was now negative due to the fees above, Defendant seized $87.30 of that tax refund to replenish her balance and the amounts it claimed she owed.  Plaintiff further alleges that over the next several days, Defendant continued to process "various transactions" on the unauthorized account, until on April 28, 2020, it ultimately decided to close that account as well.  Id. at ¶¶ 41-42.  Defendant than issued and mailed to Jimenez a check for the $84.88 remaining in that unauthorized account, presumably from the remainder of her tax return.  Jimenez sent Defendant a letter requesting an explanation for these actions

3

on April 22, 2020, to which Defendant never responded.

Plaintiff Stephanie Vil is also a citizen and resident of Florida and was a customer of TD Bank until her account was closed on May 7, 2019.  At the time it was closed her account had a negative balance of $348.49, which Defendant wrote off and referred to collections.  Vil later received demand letters from a separate party which Defendant had authorized to collect the outstanding balance.

Then, in May 2020, Defendant utilized Vil's personal information to open an account in her name without her permission.  Defendant had been notified by Nordstrom that $534.90 was being refunded to Vil due to her return of merchandise; rather than reject these funds because Vil's TD Bank account had been closed a year earlier, Defendant reopened her account, accepted the electronic funds transfer, and seized the $348.49 that Vil had owed on her previous account that had since been referred to collections.  Vil then received a letter from Defendant on May 20, 2020, enclosing a check for the remaining $186.41 from the Nordstrom refund and informing her that Defendant had closed an account in her name.  Vil disputed Defendant's ability to open this account without her permission and alleges that Defendant failed to adequately respond to her inquiries into this matter.

Plaintiff Kathy Fogel is a citizen and resident of

Massachusetts and was a customer of TD Bank until sometime in 2015, when her account was closed.  On or about September 15, 2020, Defendant opened an account in Fogel's name, utilizing her personal information to do so without her permission.  Plaintiff alleges that Defendant opened this account so that it could accept an incoming ACH deposit in the amount of $300; the Amended Complaint does not allege where this deposit came from or what it was related to.

The following day, September 16, an unauthorized transaction in the amount of $298 was deducted from the account. That transaction was then reversed nearly a week later on September 22, 2020.  The $300 was then removed from account, although the Amended Complaint does not specify whether it was removed by Plaintiff or Defendant.  Over the next few months, Defendant charged Plaintiff a $15 monthly maintenance fee and a $1 paper statement fee for both November and December 2020, totaling $32 in fees generated under the unauthorized account.

On June 24, 2020, the original complaint in this action was filed before this Court.  The parties later stipulated to Plaintiffs' filing of an Amended Complaint to add certain plaintiffs and claims, (ECF No. 26), which Plaintiffs filed on January 22, 2021.  (ECF No. 28).  The Amended Complaint is a putative class action, on behalf of the three named Plaintiffs and seeking to represent both a national class and a

Massachusetts subclass of individuals who had checking or
savings account opened in their name by TD Bank without
authorization.  Plaintiffs assert claims for breach of contract
and the implied covenant of good faith and fair dealing, unjust
enrichment, conversion, and violations of the Fair Credit and
Reporting Act, the Electronic Funds Transfer Act, and
Massachusetts Consumer Protection law on behalf of Plaintiff
Fogel.  The Amended Complaint further pursues a cause of action
for declaratory judgment, seeking an order declaring Defendants'
alleged practice of opening accounts without authorization
unlawful.

Finally, Defendant moved to dismiss all claims on February
19, 2021.  (ECF No. 32).  Plaintiffs filed a brief in opposition
to the motion on March 12, (ECF No. 34), and Defendant then
filed a reply brief in further support on March 26.  (ECF No.
36).  The motion is therefore fully briefed and ripe for
adjudication.

**DISCUSSION**

I.   **Subject Matter Jurisdiction**

This Court has jurisdiction over this matter pursuant to 28
U.S.C. § 1332(d)(2), the Class Action Fairness Act (CAFA), which
provides, in relevant part, that "district courts shall have
original jurisdiction of any civil action in which the matter in
controversy exceeds the sum or value of $5,000,000, exclusive of

6

interest and costs, and is a class action in which . . . (A) any member of a class of plaintiffs is a citizen of a State different from any defendant."

## II.   Standard for Motion to Dismiss under Rule 12(b)(6)

When considering a motion to dismiss a complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. Evancho v. Fisher, 423 F.3d 347, 351 (3d Cir. 2005).  It is well settled that a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (alteration in original) (citations omitted) (first citing Conley v. Gibson, 355 U.S. 41, 47 (1957); Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994); and then citing Papasan v. Allain, 478 U.S. 265, 286 (1986)).

To determine the sufficiency of a complaint, a court must take three steps: (1) the court must take note of the elements a plaintiff must plead to state a claim; (2) the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth; and (3) when there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief. Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 664, 675, 679 (2009) (alterations, quotations, and other citations omitted).

A district court, in weighing a motion to dismiss, asks "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim." Twombly, 550 U.S. at 563 n.8 (quoting Scheuer v. Rhoades, 416 U.S. 232, 236 (1974)); see also Iqbal, 556 U.S. at 684 ("Our decision in Twombly expounded the pleading standard for 'all civil actions' . . . ."); Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) ("Iqbal . . . provides the final nail in the coffin for the 'no set of facts' standard that applied to federal Amended Complaints before Twombly."). "A motion to dismiss should be granted if the plaintiff is unable to plead 'enough facts to state a claim to relief that is plausible on

its face.'"  Malleus, 641 F.3d at 563 (quoting Twombly, 550 U.S. at 570).

A court in reviewing a Rule 12(b)(6) motion must only consider the facts alleged in the pleadings, the documents attached thereto as exhibits, and matters of judicial notice. S. Cross Overseas Agencies, Inc. v. Kwong Shipping Grp. Ltd., 181 F.3d 410, 426 (3d Cir. 1999).  A court may consider, however, "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."  Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).  If any other matters outside the pleadings are presented to the court, and the court does not exclude those matters, a Rule 12(b)(6) motion will be treated as a summary judgment motion pursuant to Rule 56.  Fed. R. Civ. P. 12(b).

## III. Analysis

Plaintiffs' Amended Complaint asserts seven causes of action: (1) breach of contract and the covenant of good faith and fair dealing; (2) unjust enrichment; (3) conversion; (4) violations of the Fair Credit Reporting Act; (5) violations of the Electronic Funds Transfer Act; (6) a claim for declaratory relief; and (7) violation of the Massachusetts Consumer Protection Law.  Defendants, unsurprisingly, move for dismissal of all claims.  The Court will address the claims in the order

in which they appear in the Amended Complaint.

A. Claims for Breach of Contract and Covenant of Good Faith and Fair Dealing

Plaintiffs first pursue linked claims for breach of contract and breach of the implied covenant of good faith and fair dealing.  "A federal district court applies the forum state's choice of law rules to diversity actions." Lawmen Supply Co. of N.J., Inc. v. Glock, Inc., 330 F. Supp. 3d 1020, 1028 (D.N.J. 2018).  New Jersey's rules provide that "'[o]rdinarily, when parties to a contract have agreed to be governed by the laws of a particular state, New Jersey courts will uphold the contractual choice.'" Collins v. Mary Kay, Inc., 874 F.3d 176, 183-84 (3d Cir. 2017).  Both parties here appear to agree that Florida law governs Plaintiffs Jimenez and Vil's claims, and Massachusetts law governs Plaintiff Fogel's claims.[1]

To state a valid cause of action under both Florida and Massachusetts law, a plaintiff must establish three elements: (1) the existence of a valid contract, (2) breach of that contract, and (3) damages.  Calderon v. Sixt Rent a Car, LLC, 2020 WL 700381, at *5 (S.D. Fla. Feb. 12, 2020); Scholz v. Goudreau, 901 F.3d 37, 43 (1st Cir. 2018).  See also Dunkin'

---

[1] The parties additionally appear to agree that Florida and Massachusetts law govern the Florida and Massachusetts Plaintiffs' respective unjust enrichment and conversion claims.

Donuts Franchised Rests. LLC v. Cardillo Capital, Inc., 551 F.
Supp. 2d 1333, 1336 n.2 (M.D. Fla. 2008) ("[T]he elements of a
breach of contract claim are nearly identical under the laws of
Massachusetts and Florida.").

Defendant's central argument for dismissal of the breach of
contract claims is that Plaintiffs have simply failed to plead
that any specific provision of the Agreement here was breached.
Plaintiffs have put forward several general arguments for why
they have successfully pled claims for breach of contract.
Plaintiffs start by directing the Court, both in the Amended
Complaint itself and in their opposition brief, to four separate
passages from the Agreement that they contend were breached by
Defendant's actions.

First, Plaintiffs plead that "the Agreement only provides
for TD to remove customer funds from an 'Account,'" which they
argue "exclude[s] accounts not opened by the customer."  (Am.
Compl. at ¶ 85).  Plaintiffs' argument here merely points the
Court to the Agreement's definitions of the terms "Account" and
"You."  The definitions section of the Agreement defines
"Account" to mean "your Checking Account, Money Market Account,
personal CD Account and/or Savings Account with us, including
Individual Retirement Accounts (IRAs), as applicable, unless
limited by the heading under which it appears."  (ECF No. 28-1
at 4).  Plaintiffs argue that because this definition refers to

11

"*your* Checking Account" and the Agreement separately defines "You" and "your" to mean "each depositor who opens an Account, and any joint owner of each Account," any actions taken by Defendant which the Agreement permits it to take against an "Account" necessarily were not permitted as to the unauthorized accounts it re-opened in the plaintiffs' names.  Related to this, Plaintiffs point out that the Agreement then requires customers to pay certain fees and allow certain deductions associated with such "Accounts."  Based on these definitions, Plaintiffs therefore argue that Defendant's actions constitute breach of contract.

    As Defendant notes, Plaintiffs are attempting "to import contract-altering meaning into" extremely basic definitions of two general words used throughout the Agreement.  But while the Court is hesitant to find that such definitions, and the specific provisions relied upon by Plaintiffs, are sufficient to serve as the basis for a breach of contract claim, Plaintiffs' argument on this front runs into an even more basic issue.  The Agreement itself, which is fully titled the "Personal Deposit Account Agreement," makes clear on the first page that it "governs the terms and conditions of your personal deposit Account(s) with us."  Even were the Court to agree with Plaintiffs that their re-opened accounts are not included within the definitions of "Account," the clear result of such a finding

would be that the Agreement itself does not cover those re-
opened accounts.  And as Defendant notes, "if no contract
governed the relationship between the parties and the
transactions Plaintiffs dispute, then Plaintiffs cannot proceed
on a claim for breach of contract."  (ECF No. 32-1 at 32)
(citing Friedman v. N.Y. Life Ins. Co., 985 So. 2d 56, 58 (Fla.
Dist. Ct. App. 2008) (existence of contract required element for
Florida law contract breach claim); Pollalis v. President &
Fellows of Harvard Coll., 2019 WL 1261472, at *2 (Mass. App. Ct.
Mar. 18, 2019) (same under Massachusetts law)).  Either way,
Plaintiffs attempt to base a breach of contract claim on these
provisions necessarily fails.

Plaintiffs next point to a separate provision, titled
"Important Information for Opening a New Account," which
provides the following:

> To help the government fight the funding of
> terrorism and money laundering activities, Federal
> law requires all financial institutions to obtain,
> verify and record information that identifies each
> person who opens an Account. When you open an
> Account, we will ask for your name, legal address,
> date of birth, Social Security or Tax
> Identification Number, and other information that
> will allow us to identify you. We may also ask to
> see your driver's license or any other identifying
> documents.

(ECF No. 28-1 at 14).

Plaintiffs cite this provision for the proposition that,
under the Agreement, "Accounts are not permitted to be opened

without express customer consent." (Am. Compl. at ¶ 87). But on its face, the provision states nothing of the sort. Instead, the provision clearly does nothing more than inform customers of the types of information that TD Bank may request be provided by customers before opening an account due to the requirements of federal anti-terrorism and money laundering laws. This provision simply does not make any statements whatsoever regarding whether express customer consent is needed before opening, or in this case re-opening, an account. Nor do these requirements even help with Plaintiffs' breach of contract claims more generally, as Plaintiffs' themselves seem to have affirmatively pled that Defendant actually abided by the requirements found in this provision: the Amended Complaint itself repeatedly alleges that TD Bank retained Plaintiffs' personal information, gathered during the opening of their initial accounts, and utilized it later to re-open their accounts, meaning that the Bank did in fact ensure it had this information before it opened the accounts in question. (Am. Compl. at ¶¶ 35, 49, 61). Once again, Plaintiffs' attempt to base their breach of contract claim off this specific provision fails.

Third, Plaintiffs direct the Court to the following provision, titled "If You Owe Us Money:"

> If you withdraw funds from your Account that you do not have a right to withdraw, including the amount of a check or other item which we later charge back to your Account or any amounts that may be credited to your Account in error, you will have to pay us back. If you do not, the Bank may apply the funds in or deposits to your Account (or any other related account) against the debt or obligation owed to us, without providing notice to you, except that this provision does not apply to any consumer credit covered by the federal Truth in Lending law.

(ECF No. 28-1 at 21-22).

According to Plaintiffs, this provision "preclude[s] the opening of an account without customer authorization in order to seize funds TD claims it is owed." (Am. Compl. at ¶ 88). But Plaintiffs have failed to persuasively demonstrate how the language quoted above created any such contractual requirement. To the contrary, the Court agrees with Defendant that this provision "allows TD to withdraw from Plaintiffs' accounts funds to which it is entitled . . . without notice." (ECF No. 32-1 at 26-27). Nor does Plaintiffs' opposition brief put forward any argument opposing Defendant's motion to dismiss the claim on this basis.

Fourth, Plaintiffs assert that "seizure of funds violated other terms of the Agreement," (Am. Compl. at ¶ 89), relying specifically on a provision which states that "You will owe us for any fees or transactions that are pending during the Account closure process or that post to your Account before we close the Account." (ECF No. 28-1 at 27). But once again, neither

15

Plaintiffs' Amended Complaint nor their opposition brief explains how they believe this provision created some contractual duty that Defendant's alleged seizure of funds breached.  As Defendant notes, this provision simply provides customers information to consider before they decide to affirmatively close their own account.  This fact is clearly demonstrated by the immediately previous sentence in the provision in question — conspicuously excluded from the Amended Complaint — which states that "You should not close your account until all the transactions you arranged for have been paid, and you should leave enough funds to pay them and any fees."  Id.

Next, Plaintiffs simply argue that both Florida and Massachusetts law "recognize[s] that a form of breach includes allegations that a party exceeded their authority under a contract."  (ECF No. 34 at 8-9).  In support of this general assertion, Plaintiffs point the Court to two cases: Calderon v. Sixt Rent a Car, LLC, 2020 WL 700381 (S.D. Fla. Feb. 12, 2020) and Szulik v. State St. Bank & Trust Co., 935 F. Supp. 2d 240 (D. Mass. 2013).  However, as Defendant accurately points out, neither of these cases stand for the proposition that Plaintiffs cite them for.

Plaintiff first quotes language from Calderon which states that the defendant "did not have the contractual authority to charge the additional fees because the Face Page did not provide

16

for such fees." Calderon, 2020 WL 700381 at *5.  However,

Plaintiffs' citation here misreads that opinion.  Rather than

supporting the proposition it is cited for, the analysis quoted

by Plaintiffs instead simply relates to those parties' dispute

over whether the terms of a Rental Agreement included only the

"Face Page" that the plaintiff there had signed, or if it also

incorporated additional terms found in a separate "Rental

Jacket," which would have granted the defendant the contractual

right to charge certain fees.  The court there, rather than

making any statement or finding that would support Plaintiffs'

argument in this case, analyzed whether, under Florida law's

"incorporate-by-reference" doctrine, the signed agreement had

incorporated those additional terms; it found that whether the

signed document "'sufficiently described' the Rental Jacket and,

therefore, whether [the plaintiff] was deemed to have read and

accepted the terms of the entire 'Rental Agreement' is something

properly left to the province of the factfinder." Id. at *5-6.

No similar arguments or issues have been raised in this case,

and therefore Calderon does not save Plaintiffs' claims.

As for the second case, Szulik, Plaintiffs contend that the

court's statement that "State Street exceeded its authority or

otherwise breached its contractual obligations by accepting

obviously defective and valueless securities in lieu of

legitimate assets" also supports their arguments here.  But once

17

again, Plaintiffs' cited case law does not support their
argument.  Instead, the specific discussion from Szulik
Plaintiffs direct the Court to consider simply addressed
arguments regarding the causation factor of a breach of contract
claim, and held that a factfinder could find that the
defendant's actions in accepting defective and valueless
securities, when granted the contractual duty to purchase or
receive certain assets or securities, had enabled a third party
"to pursue its deceptive scheme unchecked."  Szulik, 935 F.
Supp. 2d at 267-68.  This fact pattern in no way resembles the
case presently before the Court, and Plaintiffs have provided no
further explanation as to how this stands for the proposition it
was cited for or how it bolsters their own breach of contract
claims.  With Plaintiffs having put forth no case law more
direct or on point regarding the issue of a party exceeding its
contractual authority, the Court finds that they have failed to
demonstrate that their breach of contract claims should be
allowed to proceed on this basis.

      Finally, Plaintiffs argue that "at no point does the
Agreement provide that TD can create a new account or re-open an
old account to exercise its setoff rights."  (ECF No. 34 at 10).
This may be true.  But, more importantly for their breach of
contract claims, Plaintiff has not pointed to any provision of
the Agreement which states that TD Bank cannot re-open an

18

account it has already closed to exercise those same setoff
rights.  This final argument relates rather directly to
Plaintiffs' emphatic assertion that "[a] company simply cannot
open an account without the customer's knowledge and charge fees
without authorization; the very idea is ludicrous."  (ECF No. 34
at 10).  Even assuming this statement is accurate and true, it
simply is not an argument against dismissal of Plaintiffs'
breach of contract claims.  While, as the Court will address
below, such actions very well may expose Defendant to civil
liability under other theories or statutes, improper or even
illegal actions are not necessarily breaches of contract, and
the Court's duty at this stage is to assess the sufficiency of
Plaintiffs' pleadings.  Plaintiffs have not pled that
Defendant's actions breached any specific provision of the
Agreement.  Therefore, Defendant's motion to dismiss will be
granted as to Count I of the Amended Complaint.

Since Plaintiffs' breach of contract claims will be
dismissed, Defendant argues that their claim for breach of the
implied covenant of good faith and fair dealing must also be
dismissed.  A "breach of the implied covenant of good faith and
fair dealing is not an independent cause of action[; it]
attaches to the performance of a specific contractual
obligation," and therefore "a claim for a breach of the implied
covenant of good faith and fair dealing cannot be maintained

19

under Florida law in the absence of a breach of an express term of a contract." Centurion Air Cargo, Inc. v. United Parcel Serv. Co., 420 F.3d 1146, 1151-52 (11th Cir. 2005).  The same is true under Massachusetts law.  See T.W. Nickerson, Inc. v. Fleet Nat'l Bank, 924 N.E.2d 696, 704 (Mass. 2010) ("[T]he 'scope of the covenant is only as broad as the contract that governs the particular relationship,'" and "[i]t cannot 'create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance.'") (citations omitted).

Plaintiffs do not dispute this argument, and simply state that because they believe they "have stated a valid breach of contract claim, TD Bank's argument fails."  Since the Court has already decided that Plaintiffs' breach of contract claims must be dismissed, so to must their claims for breach of the implied covenant of good faith and fair dealing.

B. Claims for Unjust Enrichment

The Court turns next to Count II of the Amended Complaint, wherein Plaintiffs assert claims for unjust enrichment. Defendant puts forward three arguments for why Plaintiffs' unjust enrichment claims should be dismissed.

First, Defendant argues that "to the extent that Plaintiffs

intend to proceed on a breach of contract theory, they cannot at the same time go forward alleging unjust enrichment." (ECF No. 32-1 at 33). Specifically, they note that under Florida law, "[u]njust enrichment cannot apply where an express contract exists which allows the recovery," IberiaBank v. Coconut 41, LLC, 984 F. Supp. 2d 1283, 1296 (M.D. Fla. 2013), and "Massachusetts law does not allow litigants to override an express contract by arguing unjust enrichment." Platten v. HG Berm. Exempted Ltd., 437 F.3d 118, 130 (1st Cir. 2006) (citing Zarum v. Brass Mill Materials Corp., 134 N.E.2d 141, 143 (Mass. 1956)). Although Plaintiffs do not dispute that these are accurate statements of the law in those states, Defendant's argument does not warrant dismissal of their unjust enrichment claims at this stage of the proceeding.

Despite arguing for dismissal on this basis, Defendant later openly concedes that "Plaintiffs are correct that courts permit the pleading of unjust enrichment claims in the alternative to contract claims." (ECF No. 36 at 11-12). Nor could it argue otherwise, as Plaintiffs' statement of the law is clearly correct. See FabriClear, LLC v. Harvest Direct, LLC, 481 F. Supp. 3d 27, 35 (D. Mass. 2020) (while unjust enrichment is viable to the extent a party cannot establish an enforceable contract, a plaintiff "may assert both claims in its Amended Complaint, but ultimately, they provide mutually exclusive

avenues of relief"); Aceto Corp. v. TherapeuticsMD, Inc., 953 F. Supp. 2d 1269, 1287 (S.D. Fla. 2013) ("While the theory of unjust enrichment is equitable in nature and is, therefore, not available where there is an adequate legal remedy, a plaintiff may maintain an unjust enrichment claim in the alternative to its legal claims").  Instead, Defendant argues that because elsewhere in their Amended Complaint and brief Plaintiffs argue that the Agreement does govern the conduct underlying the Amended Complaint here, their unjust enrichment claims must be dismissed.  This argument misunderstands the concept of pleading claims in the alternative.  And further, no such issue is raised at this stage, as the Court has already held that Plaintiffs' breach of contract claims must be dismissed.

However, as Defendant notes, under Massachusetts law "a party with an adequate remedy at law cannot claim unjust enrichment."  (ECF No. 32-1 at 33 (quoting Shaulis v. Nordstrom, Inc., 865 F.3d 1, 16 (1st Cir. 2017).  As will be discussed below, Plaintiff Fogel further alleges that Defendant's actions constitute violations of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, § 2.  But Massachusetts law is clear that "[t]he availability—regardless of the likelihood of success—of a claim under chapter 93A precludes a claim for unjust enrichment."  Ferreira v. Sterling Jewelers, Inc., 130 F. Supp. 3d 471, 487 (D. Mass. 2015) (citing Fernandes v. Havkin,

22

731 F. Supp. 2d 103, 114 (D. Mass. 2010)).  See also O'Hara v.
Diageo-Guinness, USA, Inc., 306 F. Supp. 3d 441, 466 (D. Mass.
2018) (dismissing unjust enrichment claim because plaintiff's
claims for "violations of Chapter 93A provide available
remedies").  "The disposition of those claims is irrelevant.
Their mere availability is a bar to a claim of unjust
enrichment."  Fernandes v. Havkin, 731 F. Supp. 2d 103, 114 (D.
Mass. Aug. 10, 2010).  Since Plaintiff Fogel is pursuing a
separate claim under the MCPA based on the same underlying
conduct, and since, as the Court will discuss in greater detail
below, Plaintiff Fogel's MCPA claims will survive the present
motion to dismiss, her unjust enrichment claim must therefore be
dismissed.

Defendant next argues that the other two Plaintiffs "cannot
plausibly allege that TD was unjustly enriched by requiring
Plaintiffs to pay for goods and services that Plaintiffs
purchased using their TD accounts."  (ECF No. 32-1 at 34).
However, Plaintiffs correctly point out that Defendant's
argument here relies entirely on facts regarding Plaintiffs'
payments and fees that are outside the realm of the Amended
Complaint and is simply an attempt to dispute the factual
allegations and undercut the substance of Plaintiffs' claims.
As was explained above, when it is considering a Rule 12(b)(6)
motion to dismiss for failure to state a claim, the Court must

only consider the facts alleged in the pleadings, the documents

attached thereto as exhibits, and matters of judicial notice.

S. Cross Overseas Agencies, Inc. v. Kwong Shipping Grp. Ltd._,

181 F.3d 410, 426 (3d Cir. 1999).  The most cursory review of

Defendant's arguments here, which rely on facts introduced into

the record for the very first time in their motion to dismiss,

makes clear that none of these facts nor the "Reitze Letter"

Defendant relies upon can be found in the Amended Complaint nor

in any documents that are the basis for Plaintiffs' claims.  The

Court will not consider these facts, and Defendant's arguments

on this front will be disregarded at this stage.  Defendant may

properly raise such arguments in a motion for summary judgment.

Finally, Defendant contends that because the Agreement

permits TD Bank to assess certain fees for its services, "TD

cannot have been unjustly enriched by assessing Ms. Jimenez fees

in exchange for her acceptance of the services TD provides."

(ECF No. 32-1 at 35).  But this argument either misunderstands

or purposefully misconstrues the basis for Plaintiff Jimenez's

unjust enrichment claim.  Jimenez pleads that Defendant opened

the account in her name without her permission, and therefore

did not have a contractual basis for assessing such fees

associated with maintaining that account; her claim is that

Defendant was unjustly enriched specifically because the

Agreement did not govern that account and its actions were not

taken pursuant to any valid contract.  Accordingly, Defendant's
argument on this front also fails.  The motion to dismiss will
be denied as to Plaintiffs Jimenez and Vil's claims for unjust
enrichment.

   C. Claims for Conversion

   Count III of the Amended Complaint asserts claims for
conversion on behalf of all three Plaintiffs.  To state a claim
for conversion under Massachusetts law a plaintiff must plead
that: "(1) the defendant intentionally and wrongfully exercised
control or dominion over the personal property; (2) the
plaintiff had an ownership or possessory interest in the
property at the time of the alleged conversion; (3) the
plaintiff was damaged by the defendant's conduct; and (4) if the
defendant legitimately acquired possession of the property under
a good-faith claim of right, the plaintiff's demand for its
return was refused."  Wollaston Indus., LLC v. Ciccone, 2019 WL
6841987, at *2 (D. Mass. Dec. 16, 2019) (quoting Evergreen
Marine Corp. v. Six Consignments of Frozen Scallops, 4 F.3d 90,
95 (1st Cir. 1993)).  Under Florida law, conversion is an
"unauthorized act which deprives another of his property
permanently or for an indefinite period of time."  Fogade v. ENB
Revocable Trust, 263 F.3d 1274, 1291 (11th Cir. 2001).  "Thus,
in order to state a claim of conversion, one must allege facts
sufficient to show ownership of the subject property and facts

25

that the other party wrongfully asserted dominion over that property." Industrial Park Development Corp. v. American Exp. Bank, FSB, 960 F.Supp.2d 1363, 1366 (M.D. Fl. 2013) (quoting Edwards v. Landsman, 51 So.3d 1208, 1213 (Fla. 4th DCA 2011)).

Defendant's central argument for dismissal of these claims is relatively straightforward: it argues that under Florida and Massachusetts law, funds deposited in a bank account like those here simply cannot be the basis of a conversion claim. Under Florida law, "[f]or money to be the object of conversion, 'there must be an obligation to keep intact or deliver the specific money in question, so that [the] money can be identified.'" Longhi v. AMG Financial Group, Inc., No. 19-23047-Civ-WILLIAMS/TORRES, 2020 WL 7481167, at *3 (S.D. Fl. Jan. 24, 2020) (quoting Gasparini v. Pordomingo, 972 So. 2d 1053, 1056 (Fla. 3d DCA 2008)). This typically occurs when parties "deposit their money into a trust or escrow account, or some similar arrangement 'where there is an obligation or fiduciary duty to keep money segregated.'" List Industries, Inc. v. Wells Fargo Bank, N.A., No. 17-cv-61204-GAYLES, 2018 WL 4334876, at *6 (S.D. Fl. Sept. 11, 2018) (quoting Batlle v. Wachovia Bank, N.A., No. 10-21782-CIV, 2011 WL 1085579, at *1 (S.D. Fla. Mar. 21, 2011)). But in cases "where the parties have an open account, and the defendant is not required to pay the plaintiff identical moneys which he collected, there can be no action in tort for

26

conversion" because "[a] mere obligation to pay money may not be enforced by a conversion action." <u>Fagan v. Central Bank of Cyprus</u>, No. 19-80239-CIV-Rosenberg/Reinhart, 2021 WL 2845034, at *14 (S.D. Fl. June 28, 2021) (quoting <u>Belford Trucking v. Zagar</u>, 243 So. 2d 646, 648 (Fla. 4th DCA 1970)).

Here, the Court finds that, analyzing the Complaint in the light most favorable to Plaintiffs at the pleadings stage, Plaintiffs have pled facts sufficient to demonstrate that the funds in their accounts that Defendant seized were specific and identifiable enough to serve as the basis for plausible conversion claims. First, Plaintiff Vil has not simply alleged a general deposit into an "open account;" instead, she has alleged that TD Bank itself opened an unauthorized account in her name for the direct purpose of receiving a specific transfer of funds from Nordstrom, which were being sent to Plaintiff as a refund for a returned purchase. Since TD Bank allegedly opened this account itself, Vil necessarily could not have had any previous funds in the account, and therefore, at least at the pleadings stage, the Court finds that those funds were sufficiently identifiable and that TD Bank had a specific obligation to provide those funds — which it had gone out of its way to accept — to Vil. While these allegations presents a close call, the fact that the funds being allegedly converted here were a specific amount that Plaintiff presumably had a

27

contractual entitlement to receive from Nordstrom which were being transferred as part of a one-off payment, combined with the fact that TD Bank allegedly opened an unauthorized, otherwise empty account in her name solely because it had learned that Nordstrom was attempting to transfer money to Vil and TD Bank specifically wanted to seize those funds, brings this claim within the realm of plausible conversion claims under Florida law described above.

The Court reaches the same conclusion regarding Plaintiff Jimenez's claim, for similar reasons.  Like Vil, Jimenez alleges that Defendant seized a specific amount of money sent to her in the form of a tax refund after opening an unauthorized account in her name.  In other words, TD Bank seized money presumably sent to her by the Internal Revenue Service or the Florida equivalent for the purposes of issuing her a refund that she was entitled to under federal or state law, with no prior related transaction involving the bank account having been necessary or alleged here.  Since Jimenez's account was previously closed, Jimenez is therefore similarly alleging that TD Bank opened an unauthorized account in her name and then used that opened account, which had no other funds in it, to receive her tax refund and seize a percentage of it.

While this again presents a somewhat close call under the Florida law outlined above, Jimenez has pled both the specific

party the funds in question were being transferred to her by,
that TD Bank went out of its way to intercept those funds
intended solely for her, and that these were the only funds that
were available in her account and therefore were easily
identifiable; such a claim appears, to the Court, to come close
to the exact type of situation common law conversion is meant to
cover.  While the Court again stresses that it reaches this
conclusion only at the pleadings stage, having viewed the
factual allegations in the light most favorable to the
Plaintiffs, it finds that Plaintiffs Jimenez and Vil's
conversion claims may proceed.  Defendant's motion to dismiss
will be denied as to both claims.

The Court reaches a different conclusion regarding
Plaintiff Fogel's conversion claim.  Under Massachusetts law,
"[b]anks are not liable for conversion when they fail to pay
funds that they owe to a customer," because "[t]he customer does
not have a right to the 'specific fund[s]' transferred to the
collecting bank."  Gossels v. Fleet Nat. Bank, 453 Mass. 366,
379 (2009) (citing Freeman's Nat'l Bank v. National Tube-Works,
Inc., 151 Mass. 413, 418, 24 N.E. 779 (1890)).  Accordingly, the
Massachusetts Supreme Judicial Court has explicitly held that
"[c]onversion occurs only when a defendant exercises wrongful
control over specific personal property, not a debt; therefore,
bank accounts cannot be the subject of conversion."  Id. (citing

Reliance Ins. Co. v. U.S. Bank, 143 F.3d 502, 506 (9th Cir.
1998)).  And just as importantly, Fogel, unlike Jimenez and Vil,
has failed to plead facts sufficient to plausibly state a claim
for conversion even under the less strict Florida rule described
above — the simple fact that the account was allegedly opened to
receive an electronic transfer, with no more information
provided or facts alleged regarding where the money was being
transferred from or for what reason it was being sent, is
insufficient to state a claim for conversion under the standards
outlined herein.  Given the clear statement of the law by the
highest court in Massachusetts and the Complaint's lack of more
specifically pled factual allegations, the Court finds that
Plaintiff Fogel's conversion claim must also be dismissed.

　　　D. Fair Credit Reporting Act Claims

　　　Count IV of the Amended Complaint alleges violations of the
Fair Credit Reporting Act ("FCRA"), centered on TD Bank's
alleged reporting to credit reporting agencies that certain
accounts were open, when they were in fact closed.  Defendant
argues that Plaintiff's claims fail under the restrictions
imposed on private causes of action under the FCRA.

　　　Defendant is correct.  Plaintiffs' claims are based in two
provisions of the FCRA: 15 U.S.C § 1681s-2(a), which imposes a
duty on parties like TD Bank to provide accurate information,
and § 1681s-2(b), which imposes a duty to investigate the

completeness and accuracy of the information furnished in certain circumstances.  Plaintiffs further assert that Defendant is civilly liable for their violations of these duties under two separate sub-provisions of the FCRA, which provide for private causes of action under the statute: 15 U.S.C. §§ 1681n and 1681o.  (ECF No. 28 at ¶ 127).

However, Plaintiffs claims run into fatal issues under either provision.  First, Plaintiffs' claim for violation of § 1681s-2(a) fails on its face for a very simple reason: while §§ 1681n and 1681o create civil liability for violations of the duties imposed by the FCRA, they "cannot be used by a private individual to assert a claim for a violation of § 1681s-2(a), as such claims are available only to the Government."  SimmsParris v. Countrywide Financial Corp., 652 F.3d 355, 358 (3d Cir. 2011) (citing 15 U.S.C. § 1681s-2(c) ("[S]ections 1681n and 1681o of this title do not apply to any violation of—(1) subsection (a) of this section....") and § 1681s-2(d) ("The provisions of law described in paragraphs (1) through (3) of subsection (c) of this section ... shall be enforced exclusively ... by the Federal agencies and officials and the State officials identified in section 1681s of this title.")); see also Tauro v. Capital One Fin. Corp., 684 F. App'x 240, 242 (3d Cir. 2017) ("[T]he FCRA prohibits private enforcement of the duties arising under § 1681s-2(a).").

Second, although private citizens can bring claims for violations of § 1681s-2(b), Plaintiffs' claims for violation of the duties imposed by that provision are also fatally deficient. Specifically, the duties that are placed on furnishers of information like TD Bank by § 1681s-2(b) are implicated only "[a]fter receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency."  15 U.S.C. § 1681s-2(b)(1).  But "[n]otice under § 1681i(a)(2) must be given by a credit reporting agency, and cannot come directly from the consumer."  SimmsParis, 652 F.3d at 358.  And while "[a] consumer may certainly notify a furnisher/creditor directly about her dispute, ... there is no private cause of action under § 1681s-2(b) for a furnisher's failure to properly investigate such a dispute."  Stefanowicz v. SunTrust Mortg., 765 F. App'x 766, 773 (3d Cir. 2019).  There are no allegations in the Amended Complaint that Defendant received any notice of a credit reporting dispute from any credit reporting agency related to the claims underlying Plaintiffs' FCRA cause of action, and therefore Defendant had no duty to undertake any investigation.

Plaintiffs, in their opposition brief, put forth only one argument against dismissal: that their claims were not actually brought for violation of §§ 1681s-2(a) and (b), but instead were

private actions under §§ 1681n and 1681o.  However, this

argument fails on its face.  Sections 1681n and 1681o do not

provide independent bases for civil liability, but instead

provide private rights of action for violations of other

requirements: § 1681n provides for civil liability for "[a]ny

person who willfully fails to comply with any requirement

imposed under this subchapter," while § 1681o similarly provides

for civil liability for "[a]ny person who is negligent in

failing to comply with any requirement imposed under this

subchapter."  The only FCRA requirements the Amended Complaint

references that could therefore serve as the basis for civil

liability under either of these provisions are the duties

imposed by §§ 1681s-2(a) and (b).  Since Plaintiffs' Amended

Complaint cannot sustain claims for violation of either of those

duties for the reasons explained above, Count IV of the Amended

Complaint must be dismissed.

E. <u>Electronic Funds Transfer Act Claims</u>

Count V of the Amended Complaint alleges violations of the

Electronic Funds Transfers Act ("EFTA"), 15 U.S.C. § 1693, *et

seq*.  Plaintiffs specifically allege three distinct violations

of the EFTA: (1) that Defendant violated § 1693i(a) by issuing

unauthorized means of access to customer accounts, (2) that

Defendant violated the EFTA's error resolution provision, §

1693f, and (3) that Defendant violated the EFTA's consumer

liability provision, § 1693g.  The Court will address
Defendant's arguments for dismissal of these claims in that
order.

      1. <u>Plaintiffs' Claim under § 1693i(a)</u>

The Court will turn first to Plaintiffs' claim regarding
the issuance of unauthorized means of access.  Section 1693i(a)
of the EFTA provides that "[n]o person may issue to a consumer
any card, code, or other means of access to such consumer's
account for the purpose of initiating an electronic fund
transfer other than (1) in response to a request or application
therefor; or (2) as a renewal of, or in substitution for, an
accepted card, code, or other means of access, whether issued by
the initial issuer or a successor."

Defendant here raises only one argument for dismissal of
this claim: that Plaintiffs have not alleged that TD Bank issued
a "means of access" to any consumer account.  Defendant asserts
that Plaintiff has failed to actually allege that it ever sent
or distributed to anyone any card, code, or other means of
access by which they would be able to initiate an electronic
fund transfer.  While Defendant acknowledges that the Amended
Complaint "allege[s] generically that TD violates § 1693i(a)
'every time it ... issues debit and/or credit cards,'" it
nonetheless argues that "Plaintiffs nowhere plead that TD issued
any debit or credit cards to Plaintiffs or anyone else."  (ECF

No. 32-1 at 17) (quoting Am. Compl. at ¶ 132).

The Court first agrees that Plaintiffs' conclusory reference to Defendant violating the provision "every time it . . . issues debit and/or credit cards," which is accompanied by no direct allegation that they have done so and no factual details and which is referenced nowhere else in the Amended Complaint, does not on its own to qualify as a factual allegation that Defendant issued debit or credit cards related to any unauthorized accounts that is sufficient to defeat a motion to dismiss. Nor do Plaintiffs themselves argue that this allegation was sufficient, as their opposition brief's discussion of this claim makes no reference to it at all.

Instead, Plaintiffs argue that the phrase "other means of access" in § 1693i(a) must be read to include "creating an account from which electronic transfers could and did occur." (ECF No. 34 at 5-6). In other words, Plaintiffs contend that the simple act of creating the accounts allegedly created by Defendant without authorization is, in and of itself, the issuance of a "means of access" to such an account, regardless of whether any other specific "means of access" was issued.

Neither party here has directed the Court to any case law directly interpreting this specific language, and the issue appears to be one of first impression in this Circuit. The Court must therefore undergo analysis of the statutory language

in question.  "It is axiomatic that statutory interpretation
properly begins with the language of the statute itself,
including all of its parts." Velis v. Kardanis, 949 F.2d 78, 81
(3d Cir. 1991).

As quoted above, the phrase "other means of access" appears
in § 1693i(a) as part of a list, which includes "card, code, or
other means of access."  Under the canon of *ejusdem generis*, a
"general term" ("other means of access") following a "series of
specific items" ("card" or "code") "is confined to covering
subjects comparable to the specifics it follows." U.S. v. EME
Homer City Generation, L.P., 727 F.3d 274, 292 (3d Cir. 2013)
(quoting Hall Street Assocs., LLC v. Mattel, Inc., 552 U.S. 576,
586, 128 S. Ct. 1396, 170 L.Ed.2d 254 (2008)).  See also Circuit
City Stores Inc., v. Adams, 532 U.S. 105, 114-15, 121 S. Ct.
1302, 149 L.Ed.2d 234 (2001) ("[G]eneral terms are construed to
embrace only objects similar in nature to the objects enumerated
by the preceding specific words.").

Of course, "not every general or vague phrase following an
enumerated list is a catch-all," and statutes do sometimes use
general terms "as independent and unrelated statutory
categories." EME Homer City, 727 F.3d at 293 (citing Ali v.
Fed. Bureau of Prisons, 552 U.S. 214, 226, 128 S. Ct. 831, 169
L.Ed.2d 680 (2008)).  Here, however, the phrase "other means of
access" simply "follows 'a list of specific items separated by

36

commas,'" and "[a]s the word 'other' demonstrates, this general
phrase is a residual category of the same type as the preceding
items."  Id. at 293 (quoting Ali, 552 U.S. at 225).  Those
preceding items, namely a "card" or "code," are types of
physical devices or pieces of information related to an account
that an individual would utilize to access or transfer funds to
or from that account.

The language immediately following this list supports the
same conclusion.  It is a "cardinal rule" of statutory
construction that "statutory language must be read in context
since a phrase gathers meaning from the words around it."  Hibbs
v. Winn, 542 U.S. 88, 102, 124 S. Ct. 2276159 L.Ed.2d 172 (2004)
(quoting General Dynamics Land Systems, Inc. v. Cline, 540 U.S.
581, 596, 124 S. Ct. 1236, 1246, 157 L.Ed.2d 1094 (2004)).
Here, the provision goes on to include narrowing language which
states that the referenced cards, codes, or other encompassed
devices or pieces of information that would fall within the
residual category must be "means of access to such consumer's
account."

The Court finds that the actions alleged here are
sufficient to state a claim under the EFTA.  Defendant is
correct that the provision does not imply that the account
itself is a means of access to that account.  However, the act
of opening an account in a consumer's name necessarily

37

encompasses the act of creating and assigning to that account an account number, which is separate and distinct from the account itself.  The specific purpose of an account number is to assist a consumer or bank in identifying a specific account— and the funds it contains — for the purposes of accessing those funds or making payments or transfers.  In this way, an account number is similar, although admittedly not identical, to a debit card or PIN code in that it can be actively utilized to grant access "to such consumer's account" and initiate electronic transfers.  The Court therefore finds that the account numbers, whether new or old, which identified or provided access to the disputed accounts opened in Plaintiffs' names each qualified as a "card, code, or other means of access" to those accounts under § 1693i(a).

This interpretation is in line with the Consumer Financial Protection Bureau's usage of the same "card, code, or other means of access" language in the definition of a related term in Regulation E, the EFTA's implementing regulation, as well as the related and expanded explanation found in the CFPB's Official Interpretation of Regulation E.  The CFPB has regulatory authority over most provisions of the EFTA, and therefore issues both regulations to implement the EFTA's provisions and interpretations of those regulations.  15 U.S.C. § 1693b(a)(1). The Third Circuit has counseled that "[b]ecause the agency's

guidance" as found in its Official Interpretations of the statutes over which it has regulatory authority and their corresponding regulations is "'published in accordance with the broad powers that Congress delegated to the [CFPB] to fill gaps in the statute,'" courts should "defer [to it] quite broadly" and "as long as the agency's views are not 'demonstrably irrational,' [] treat them as 'dispositive,'" Krieger v. Bank of America, N.A., 890 F.3d 429, 436 n.3 (3d Cir. 2018) (quoting Roberts v. Fleet Bank (R.I.), 342 F.3d 260, 265 (3d Cir. 2003), as amended (Oct. 21, 2003) and Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 565, 100 S. Ct. 790, 63 L.Ed.2d 22 (1980)).

In Regulation E, the CFPB defines a separate but highly similar phrase using nearly identical language to § 1693i(a): under the regulation, the term "access device" is defined to mean "a card, code, or other means of access to a consumer's account, or any combination thereof, that may be used by the consumer to initiate electronic fund transfers."  12 C.F.R. § 1005.2(a)(1).  In its Official Interpretation of Regulation E, the CFPB provides further color on this definition, putting forth a list of "Examples" of an access device or "card, code, or other means of access to a consumer's account" which includes "debit cards, personal identification numbers (PINs), telephone transfer and telephone bill payment codes, and other means that

may be used by a consumer to initiate an electronic fund transfer (EFT) to or from a consumer account."  12 C.F.R. pt. 1005, Supp. I ¶ 2(a)(1).

This CFPB interpretation supports the Court's own reading of the statute above.  First, an account number, created or provided at the time an account is opened in a consumer's name, is a form of "other means that may be used by a consumer *to initiate an electronic fund transfer*."  If, for example, a consumer was to approach a bank teller at a local TD Bank branch and attempt to initiate an electronic funds transfer in person, the consumer would almost certainly first be asked to provide, in one form or another, the account number for the account from which they would like to make their transfer.  Second, just as the Court noted was the case in § 1693i(a), Regulation E also defines the covered "access devices" to those include those devices that are means of access "to a consumer's account" — the type of access an account number can provide in certain situations or is at least a necessary part of utilizing another access device to access an account.

Ultimately, as Plaintiffs themselves note, the EFTA "is a remedial consumer statute which should be construed broadly in favor of the consumer."  Charvat v. First Nat'l Bank of Wahoo, 2012 WL 2016184, at *2 (D. Ne. June 4, 2012) (citing Campbell v. Hope Cmty. Cred. Union, 2012 WL 423432, at *2 (W.D. Tenn. Feb.

8, 2012)).  The Court interprets an account number associated with a reopened account as a "card, code, or other means of access" to a consumer's account; as the opening of a TD Bank account necessarily must be accompanied with an account number associated with that account, the Court finds that Plaintiffs have sufficiently stated a claim that Defendant violated 15 U.S.C. § 1693i(a) and their claim may move past the pleadings stage.[2]  Defendant's motion to dismiss will be denied as to this claim.

### 2. Plaintiffs' Claims under § 1693f and § 1693g

Plaintiffs' Amended Complaint also appears to allege violations of the EFTA under the theory that Defendant further violated §§ 1693f and 1693g of that act, which respectively govern the steps a financial institution must take if a consumer notifies it of an error with an electronic fund transfer and consumer liability limits.  Defendant has put forward a series

---

[2] The Court recognizes that Defendant separately argued that Plaintiffs have not sufficiently alleged that TD Bank actually "issued" a means of access to any party.  The Court finds this argument insufficient to warrant dismissal of Plaintiffs' claims here for two reasons: in order for funds to have been transferred to Plaintiffs' unauthorized, newly opened accounts in the first place, TD Bank necessarily must have issued the account numbers for those accounts at some point, and TD Bank further presumably provided those account numbers on the final statements it sent to all Plaintiffs after it re-closed their accounts after seizing their funds.  While the Court does not necessarily find that these facts are sufficient to prove Plaintiffs' claims, they are at least sufficient to avoid dismissal at the pleadings stage.

of arguments for dismissal of these claims; Plaintiffs have failed to oppose the motion to dismiss regarding these specific claims and have accordingly waived these theories.  "The failure to respond to a substantive argument to dismiss a count, when a party otherwise files opposition, results in a waiver of that count."  Griglak v. CTX Mortgage Co., LLC, No. 09-5247, 2010 WL 1424023, at *3 (D.N.J. Apr. 8, 2010) (citing Duran v. Equifirst Corp., No. 09-3856, 2010 WL 918444, at *3 (D.N.J. Mar. 12, 2009)).  See also In re Campbell Soup Co. Sec. Litig., No. 18-14385 (NLH/JS), 2020 WL 7022655, at *5 n.2 (D.N.J. Nov. 30, 2020) ("Plaintiffs did not respond to this argument in their opposition and thus have waived this theory.").  Accordingly, Defendant's motion to dismiss will be granted and their remaining EFTA claims under Count V will be dismissed.

F. Massachusetts Consumer Protection Act Claims

Next, Count VII asserts a claim by Plaintiff Fogel that Defendant, through its actions in opening accounts in Fogel's name without her consent, "engaged in unfair, deceptive, and/or unlawful acts or practices" in violation of the Massachusetts Consumer Protection Act.  (Am. Compl. at ¶¶ 141-42).  To allege a violation of the Massachusetts Consumer Protection Act ("Chapter 93A"), a plaintiff must show that the defendant engaged in trade or business and committed an unfair or deceptive practice, causing economic injury to the plaintiff.

42

<u>Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.</u>, 552
F.3d 47, 69 (1st Cir. 2009) (citing Mass. Gen. Laws c. 93A § 2).

Defendant here argues that Plaintiff has failed to
adequately plead that TD Bank engaged in either unfair or
deceptive acts.  Defendant puts forward multiple arguments for
dismissal of Count VII.  First, Defendant asserts that Fogel has
failed to adequately identify which basis for MCPA claims she is
pursuing.  The Amended Complaint, however, makes clear that
Fogel is pursuing her MCPA claim under all available theories,
and the Court finds that the allegations in the Amended
Complaint are more than sufficient to have put Defendant on
notice of which claims are being asserted against it.

Second, Defendant argues that, regardless of which theory
for violation of the MCPA Fogel is pursuing, the claim must be
dismissed since she "clearly cannot establish the required
injury because TD has 'reverse[d]' the fees assessed and
'close[d]' Ms. Fogel's account."  (ECF No. 32-1 at 39).
However, as was the case for Defendant's similar argument in
favor of dismissal of Plaintiffs' unjust enrichment claims, this
argument relies on facts and documents that are outside the
allegations of the Amended Complaint.  Plaintiff Fogel has
clearly and directly alleged that she suffered economic injury
in the form of fees assessed by TD Bank after it reopened her
closed account.  (<u>See</u> Am. Compl. at ¶¶ 54-57).  The Court must

accept all factual allegations as true on a Rule 12(b)(6) motion to dismiss, and therefore finds that Plaintiff Fogel has sufficiently pled the economic injury prong of her MCPA claim. Defendant may re-raise this argument and put forth supporting evidence for it at the summary judgment stage.

Defendant next puts forward separate arguments for why it believes Fogel has failed to adequately plead that it acted either deceptively or unfairly.  "To plausibly state a Chapter 93A claim premised on a deceptive act, the plaintiff must allege "(1) a deceptive act or practice on the part of the seller; (2) an injury or loss suffered by the consumer; and (3) a causal connection between the seller's deceptive act or practice and the consumer's injury." Tomasella v. Nestle USA, Inc., 962 F.3d 60, 71 (1st Cir. 2020) (quoting Casavant v. Norwegian Cruise Line, Ltd., 919 N.E.2d 165, 168-69 (Mass. App. Ct. 2009)).  An act or practice is deceptive if it "has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted (i.e., to entice a reasonable consumer to purchase the product)." Aspinall v. Philip Morris Cos., 442 Mass. 381, 813 N.E.2d 476, 488 (2004).

Defendant asserts only one brief argument for why Fogel's claim that TD Bank acted deceptively in violation of the MCPA must be dismissed: it contends that "TD transparently responded

44

to Ms. Fogel's letter by closing the account and not holding her liable for any withdrawals or fees. Any damages she suffered are not due to TD's actions, which in all respects have been equitable and pursuant to the Account Agreement." (ECF No. 32-1 at 40). Yet again, Defendant's argument for dismissal relies entirely on facts that are not found in the Amended Complaint, and therefore cannot be considered by the Court at this stage. As that is the only other argument Defendant has asserted for dismissal of Fogel's MCPA claim based on deceptive acts or practices, Defendant's motion to dismiss will be denied as to this claim.

Defendant also argues that Fogel has not sufficiently pled that TD Bank acted unfairly in violation of Massachusetts law. ""[A] practice or act will be unfair under [Chapter 93A of the MCPA], if it is (1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to [consumers,] competitors or other business people." Tomasella, 962 F.3d at 79 (quoting Heller Fin. v. Ins. Co. of N. Am., 410 Mass. 400, 573 N.E.2d 8, 12-13 (1991)). "Both the defendant's and the plaintiff's conduct, knowledge, and what they should have reasonably known may be factors in determining whether an act or practice is unfair." Id. (citing Jasty v. Wright Med. Tech., Inc., 528 F.3d 28, 38 (1st Cir.

2008)).

Defendant presents two reasons why Fogel's claim for unfair trade practices must be dismissed.  First, Defendant again relies upon its contention that "TD has not held her responsible for any transactions or fees on the account, and so has no connection to any possible injury she may have suffered."  (ECF No. 32-1 at 39).  According to Defendant, Fogel was the victim of identity theft, and therefore they took no unfair actions.  But, once again, this argument is entirely dependent on facts that are outside the realm of what the Court may consider at this stage in this litigation, and therefore must be rejected.

Second, Defendant contends that "TD has not violated the federal statutes or state common law claims that Plaintiffs rely on," and its actions were "in no way were contrary to an 'established concept of unfairness' or 'immoral, unethical, oppressive, or unscrupulous.'"  (ECF No. 32-1 at 39).  However, as outlined above, the Curt has already found that Plaintiff Fogel's EFTA claim for violation of 15 U.S.C. § 1693i(a) will survive Defendant's motion to dismiss.  Therefore, her claim for unfair trade practices will survive.

However, the Court notes that even had Plaintiffs' EFTA claim been dismissed at this stage, her unfair trade practices claim would have survived, nonetheless.  As mentioned above, Fogel's conversion claim will be dismissed, and even were her

unjust enrichment claim not being dismissed, the Massachusetts Supreme Judicial Court "has never upheld a Chapter 93A claim because its allegations made out a claim for unjust enrichment, much less because its allegations were in the penumbra of unjust enrichment."  Tomasella, 962 F.3d at 80.

However, "[w]hile a chapter 93A claim may fail when the cause of action upon which it is based is not legally viable, the case law makes clear that this need not be the case." Pearson v. Hodgson, 363 F. Supp. 3d 197, 208 (D. Mass. 2018) (citing Mass. Farm. Bureau Fed'n, Inc. v. Blue Cross, Inc., 403 Mass. 722, 729 (1989)) (internal citations omitted).  Instead, "[c]hapter 93A liability may exist if the defendant's conduct falls 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness' or is 'immoral, unethical, oppressive, or unscrupulous.'"  Id. (quoting Cambridge Plating Co., Inc. v. Napco, Inc., 85 F.3d 752, 769 (1st Cir. 1996)).

Plaintiffs here contend that they have stated a claim because their allegations, if accepted as true, clearly demonstrate "that TD Bank acted with an improper motive to obtain a financial advantage."  (ECF No. 34 at 18).  The Court agrees, and finds that, at least at this stage, Fogel has sufficiently pled a claim for unfair practices or acts in violation of the MCPA.  Fogel has straightforwardly alleged that

47

TD Bank either opened a new account in her name or reopened a previously closed account, without her knowledge and without seeking or obtaining her authorization, and then proceeded to charge her maintenance fees and other additional fees for two months without her even knowing the account existed.  It is worth restating here that at the pleadings stage, the Court is not only required to accept all well-pleaded facts as true, but also must view them in the light most favorable to the plaintiff.  <u>Evancho</u>, 423 F.3d at 351.  While the Court of course makes no conclusive findings regarding Defendant's potential MCPA liability under this theory, it does find that TD Bank's actions as alleged by Plaintiff Fogel might plausibly be considered "immoral, unethical, oppressive, or unscrupulous" by a reasonable factfinder, and that Plaintiffs have stated a claim sufficient to avoid dismissal at this early stage of this litigation.  Fogel's MCPA claim for unfair acts or practices also survives Defendant's motion to dismiss.[3]

**IV.  <u>Plaintiffs Request for Leave to Amend</u>**

As outlined in this Opinion, Plaintiffs Jimenez and Vil's unjust enrichment and conversion claims survive, as does

---

[3] Defendant has also moved to dismiss Count VI of the Amended Complaint, in which Plaintiffs seek declaratory relief.  Since that claim is entirely dependent on the success of Plaintiffs' other claims, and the Court will permit certain of those claims to proceed past the pleadings stage, the motion to dismiss will also be denied as to Count VI.

Plaintiff Fogel's claim for violation of the MCPA and all
Plaintiffs' claims for violation of 15 U.S.C. § 1693i(a) and for
declaratory relief; all other claims will be dismissed.  In
their opposition brief, Plaintiffs request that if the Court
finds that any of their claims were insufficiently plead, it
grant them leave to file a further amended complaint.
Defendant, unsurprisingly, opposes this request for leave to
amend, arguing that "have already amended the complaint once to
add several claims and two additional Plaintiffs, and have
provided no indication that further amendment would add
allegations sufficient to support any cognizable claim."  (ECF
No. 36 at 15).

Amendments to pleadings are governed by Federal Civil
Procedure Rule 15, which provides that the Court "should freely
give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).
The Third Circuit has shown a strong liberality in allowing
amendments under Rule 15 to ensure that claims will be decided
on the merits rather than on technicalities.  Dole v. Arco
Chemical Co., 921 F.2d 484, 487 (3d Cir. 1990); Bechtel v.
Robinson, 886 F.2d 644, 652 (3d Cir. 1989).  An amendment must
be permitted in the absence of undue delay, bad faith, dilatory
motive, unfair prejudice, or futility of amendment.  Grayson v.
Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002) (citing
Foman v. Davis, 371 U.S. 178, 182 (1962)).

The Court will grant Plaintiffs leave to amend their complaint one last time to attempt to cure certain of the deficiencies outlined in this Opinion.  As explained above, the flaws in Plaintiffs' FCRA claim under 15 U.S.C § 1681s-2(a) cannot be cured, and therefore that claim will be dismissed with prejudice.  However, the Court, having closely analyzed each of Plaintiffs' claims, finds that the rest of their claims could plausibly be replead so as to allege facts sufficient to defeat a Rule 12(b)(6) motion to dismiss.  While Plaintiffs may not in fact be able to do that for many or even all their claims, the Court finds that further amendment would not be necessarily futile.  And while Defendant notes that Plaintiffs have already amended their complaint once to add certain claims and additional parties, that amendment occurred prior to Defendant having answered the complaint or moved to dismiss and was stipulated to by Defendant itself, and parties are routinely granted leave to amend their Amended Complaint following dismissal of non-futile claims.

Finally, the Court does not believe that Defendant will be unfairly prejudiced by giving Plaintiff one last opportunity to sufficiently plead their claims.  Plaintiffs will therefore be granted leave to file a Second Amended Complaint within thirty days of the entry of this Opinion and its accompanying Order.

## CONCLUSION

For the reasons expressed above, Defendant's motion to dismiss (ECF No. 32) will be granted in part and denied in part. Plaintiffs may file a Second Amended Complaint within thirty days.

An appropriate Order will be entered.


Date: 9/25/2021                          /s Noel L. Hillman
At Camden, New Jersey                    NOEL L. HILLMAN, U.S.D.J.